# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>JEFFREY PEARLMAN,<br>        *Defendant* | Case No. 3:16-mj-437 (SALM) |

# SUPPLEMENTAL BRIEFING TO REMOVE DRUG TESTING CONDITION

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................................2

ARGUMENT .........................................................................................................3

    I.    MR. PEARLMAN SUFFERS FROM SERIOUS CHRONIC MEDICAL
        CONDITIONS THAT CAUSE HIM SEVERE PAIN .........................................3

    II.   MEDICAL MARIJUANA BECAME A SAFE ALTERNATIVE FOR OPIOIDS
        THAT GREATLY ALLEVIATED MULTIPLE MEDICAL ISSUES .....................9

    III.  THERE ARE NO MEDICALLY ADVISABLE ALTERNATIVES THAT WILL
        PROVIDE SUFFICIENT RELIEF TO MR. PEARLMAN'S CONDITIONS ........12

CONCLUSION ....................................................................................................17

# **INTRODUCTION**

On October 28, 2016, Defendant Jeffrey Pearlman moved this Court to remove drug testing from his conditions of release while on bail. Requiring Mr. Pearlman to be drug tested would effectively bar him from being able to continue to use medical marijuana, which was lawfully prescribed to him by a doctor under the State of New Jersey's medical marijuana program to treat various chronic medical conditions. Prior to his enrollment in New Jersey's medical marijuana program, Mr. Pearlman successfully worked with his doctor to break his dependency on opioids. Mr. Pearlman had become completely reliant on addictive opioids for years to manage his persistent pain. If Mr. Pearlman is now denied access to medical marijuana treatments while on bail, he would likely be forced to revert to the use of these opioids again – and face the renewed threat of addiction as well as harmful side effects – to manage his pain. A return to opioids carries obvious health risks to Mr. Pearlman.

Mr. Pearlman submits this supplemental memorandum, at the request of the Court, to: (1) provide further details concerning his medical history; (2) explain why no meaningful alternatives to medical marijuana treatments (other than opioid use) exist for him; and (3) provide medical support for the position that treatment with medical marijuana is safer for Mr. Pearlman than a reversion to potentially-addictive opioid use.

In Mr. Pearlman's case, the imposition of a drug testing condition is not required under the Bail Reform Act, which seeks only to impose the "least restrictive" conditions to ensure the defendant's presence at future Court appearances and the safety of the community. Further, the imposition of a drug testing condition in this case would impair Mr. Pearlman's ability to participate meaningfully in his defense – by forcing him to revert to the use of mind-clouding opioids – and serve as an undue punishment in advance of any adjudication of his guilt or innocence. In light of the arguments previously presented to the Court and supplemented by the facts and arguments in this memorandum, the Defendant submits that any drug testing condition imposed upon him that would prevent him from treatment and participation in New Jersey's medical marijuana program is unjust as a matter of equity and unconstitutional as a matter of law.

## ARGUMENT

### I. MR. PEARLMAN SUFFERS FROM SERIOUS CHRONIC MEDICAL CONDITIONS THAT CAUSE HIM SEVERE PAIN

Mr. Pearlman suffers from a host of chronic medical conditions, most of which derive from a severe injury to his spine that he suffered in a car accident over twenty years ago. As a consequence of these ailments, Mr. Pearlman suffers extended bouts of extreme pain and discomfort. At the request of the Court we have compiled, from available documents and medical records, a timeline of Mr.

Pearlman's medical history during the time period relevant to the criminal complaint.

### A. 2013 - 2015: Treatment by Dr. Patharkar

In 2013, Mr. Pearlman was under the treatment of Dr. Manoj Patharkar for pain management, although he also saw his primary care physician, Dr. Andrei Terentiev. Attached as Exhibit 6 is Dr. Patharkar's report from February 26th, 2013, which noted that Mr. Pearlman's range of motion was limited in all directions in the lumbar spine and diagnosed Mr. Pearlman with a lumbar joint/ligament sprain, lumbar herniated discs, and lumbar radiculopathy (i.e. damage to the nerve which can cause both local pain as well as radicular pain in an extremity - in this case, Mr. Pearlman's leg). Ex. 6; *see also* Ex. 1 (chart of medical treatment). Dr. Patharkar's diagnosis was in part based on a lumbar MRI that showed the disc herniations, and a grade one anterolisthesis at L5/S1 (i.e. where the L5 vertebrae slipped out of line with the S1 vertebrae, pinching the nerve). Ex. 6; Ex. 18 (2/2/13 lumbar spine MRI report). Dr. Patharkar's prescribed course of treatment consisted of continuing Mr. Pearlman on a regimen of medications and follow up visits. Ex. 6.

During this treatment period, Dr. Patharkar prescribed for Mr. Pearlman various opiate-based pain relievers, including oxycodone (Percocet), and oxycontin, as well as other medications for a variety of ailments including anxiety

and gastro-intestinal problems. Ex. 2 (summary of Mr. Pearlman's medications over time). In or about August 2013, Dr. Patharkar also began prescribing Subsys for Mr. Pearlman, a very powerful sublingual fentanyl spray that provides almost instantaneous pain relief.[1] Finally, to treat Mr. Pearlman's mental health issues, Dr. Patharkar prescribed antidepressant drugs and anxiety medication in 2015.

Treatment with Dr. Patharkar continued from 2013 until the Fall of 2015, during which time, in addition to the medications described above, Dr. Patharkar administered a lumbar epidural steroid injection on Mr. Pearlman. During this procedure, steroids are injected near the spinal nerve to temporarily reduce pain and inflammation. Ex. 7 (6/3/14 injection report by Dr. Patharkar). The injection provided some relief to Mr. Pearlman, but the relief proved to be temporary. Rather, during this time period, Mr. Pearlman turned with increasing frequency to the prescribed opioids and the use of Subsys; building up to a point where he was reliant on taking excessive quantities of the drugs to find relief.

### B.     Late 2015 – Mid 2016:  Treatment by Dr. Freedman

In the Fall of 2015, Mr. Pearlman began treatment with a pain specialist, Dr. Gordon Freedman. Dr. Freedman continued to prescribe large doses of opioids to manage Mr. Pearlman's pain, with the exception of Subsys that Mr. Pearlman could no longer afford because he had been terminated by Insys (which had

---

[1] As Your Honor is aware, Subsys is the fentanyl spray manufactured by Insys, Mr. Pearlman's employer during the time period relevant to the criminal complaint.

5

subsidized his Subsys costs). Dr. Freedman also continued to administer spinal injections to Mr. Pearlman, providing one at the end of 2015, and three in 2016.[2] Ex. 1. On May 25, 2016, Dr. Freedman attempted a nerve ablation (i.e. where the nerve is burned in an attempt to disrupt pain signals) with the hope that it might provide more lasting relief than the temporary effect of an injection. Unfortunately for Mr. Pearlman, while the ablation provided temporary relief, his pain continued and therefore he remained reliant on his prescribed regimen of Oxycodone, Oxycontin, and drugs for anxiety and depression.

### C. July 2016 – Present: Treatment By Dr. Sen, Dr. Diakolios, and Dr. Howard

In approximately July 2016, Mr. Pearlman began treatment with Dr. Surjya Sen. Even before his first visit with Dr. Sen, however, Mr. Pearlman met with Dr. Constantine Diakolios to discuss weaning himself from high dosages of opioid drugs on which he had become dependent. Ex. 8 (7/18/16 notes by Dr. Sen). During July and August of 2016, with guidance from Dr. Diakolios, Mr. Pearlman courageously attempted to liberate himself from his reliance on opioids. The path to break his addiction was painful, both physically and psychologically. The withdrawal process began with a course of the drug Suboxone and eventually led to complete opioid withdrawal. During this process Mr. Pearlman barely slept and

---

[2] The dates of these injections are based on insurance reimbursement forms, which do not indicate the type of injection. While the initial injections are likely epidural steroid injections, the injections preceding the ablation are likely medial branch blocks, which would be common before an ablation. In all cases, however, pain relief is delivered to the offending nerve.

suffered sustained periods of intense pain.  He wrestled with anxiety and depression while his body fought to rid its dependence on opioid-based pain killers.  His withdrawal symptoms lasted for more than a month.  As discussed *infra*, this led Dr. Sen to refer Mr. Pearlman to Dr. Howard for a medical marijuana evaluation with the hope that it could provide pain relief and help with Mr. Pearlman's digestive and mental health issues.

Dr. Sen also ordered additional MRIs, which made it apparent that Mr. Pearlman's medical problems were even greater than previously diagnosed.  On August 1, 2016, in addition to the anterolisthesis at L5/S1 (which the radiologist described now as grade 1/2), a lumbar MRI showed disc desiccations and bulges at multiple levels in the spine.  Ex. 9 (8/1/16 MRI report).  Dr. Sen thereafter diagnosed Mr. Pearlman with spondylosis (i.e. spinal degeneration), multiple herniations with radiculopathy, and severe stenosis (i.e. where the open spaces of the spinal column are narrowed, most often causing radicular pain).  Ex. 10 (8/8/16 examination by Dr. Sen).  Dr. Sen also ordered a thoracic MRI, which evidenced four additional herniated discs at T2/T3, T7/T8, T8/T9, and T9/T10.  Ex. 12 (10/1/16 MRI report).  This led Dr. Sen to add yet another diagnosis: thoracic herniation with radiculopathy.  Ex. 13 (10/5/16 examination by Dr. Sen).

Mr. Pearlman's pain consistently rated as a 6/10 or more during every doctor visit – whether it be locally in his spine or radiating to his leg.  Ex. 6 (2/26/13

examination by Dr. Patharkar) (pain is 8-9 out of 10); Ex. 8 (7/18/16 examination by Dr. Sen) (local pain is 2, but radiating pain to leg is 10); Ex. 10 (8/8/16 examination by Dr. Sen) (pain is 6/10); Ex. 11 (9/21/16 examination by Dr. Sen) (pain is 6/10); Ex. 13 (10/5/16 examination by Dr. Sen) (local pain is 2, but radiating pain to leg is 7).

In short, before being recommended for medical marijuana treatment, it was clear that Mr. Pearlman suffered from a multitude of spinal, psychological, and gastrointestinal issues. Prior doctors had attempted injections (which provided only temporary relief), a nerve ablation (which did not alleviate his pain for any extended period of time), and extremely high doses of opioids (in addition to antidepressants, among other medications). As indicated in our initial brief, before medical marijuana, the opioids controlled Mr. Pearlman's life. There are serious risks in taking such high levels of opioids and they carried with them significant side effects including cloudy thinking, fatigue, lack of focus, and other physical issues such as rotting teeth.

Finally, each medication that Mr. Pearlman took and every procedure that his doctors performed incurred substantial costs. Most notably, Mr. Pearlman was charged $1010.85 for his monthly dose of Oxycontin. Ex. 15.[3] This pales in comparison, however, to the cost of just one epidural steroid injection ($13,376) or

---

[3] Note that Dr. Jennifer Goonetilleke, who signed this prescription, works with Dr. Freedman.

8

one nerve ablation ($18,151). Exs. 16, 17. Mr. Pearlman currently has health insurance through a COBRA from his prior employer. Once Mr. Pearlman's COBRA terminates, he does not expect to have an ability to pay for the continuous injections and/or more expensive treatment options. In contrast, one month of medical marijuana costs approximately $500 – a still difficult, but much more manageable cost.

II. **MEDICAL MARIJUANA BECAME A SAFE ALTERNATIVE TO OPIOIDS THAT GREATLY ALLEVIATED MULTIPLE MEDICAL ISSUES**

On August 8, 2016, due to Mr. Pearlman's long history of pain and his courageous decision to stop using opioids, Dr. Sen referred Mr. Pearlman to Dr. Brandon Howard, an internist in Hackensack, NJ, to see if he was a candidate for medical marijuana. Dr. Howard examined Mr. Pearlman on August 18, 2016, and determined that medical marijuana could greatly benefit Mr. Pearlman. Ex. 4 (1/19/17 report summarizing 8/18/16 notes); Ex. 19 (certification). With Dr. Howard's certification, Mr. Pearlman thereafter obtained his New Jersey medical marijuana card. Ex. 5.

Attached as Exhibit 3 is a letter submitted by Dr. Howard reflecting his determination that medical marijuana is a vital treatment for Mr. Pearlman. Ex. 3. Dr. Howard describes how Mr. Pearlman was prescribed narcotics, other drugs, and injections, but "continues to suffer with back pain, radiculopathy, and paresthesis, and muscle spasticity from herniated disks and nerve impingement."

Ex. 3. Dr. Howard notes that Mr. Pearlman "took it upon himself to undergo the stress of withdrawal because he no longer wanted to be dependent upon opioids." *Id.* Dr. Howard stresses that surgery is not a pragmatic option because it would involve multiple surgeries, multiple periods of recuperation between each one, and even then "has limited efficacy long term, and is associated with many risks." *Id.* He ends his letter by requesting that this Court allow Mr. Pearlman to continue taking medical marijuana:

> Mr. Pearlman has demonstrated less pain overall, more mobility, more mental focus, and less anxiety. This has had a dramatic effect on his quality of life. He is currently more functional on medical marijuana than he ever was on opioids and benzodiazepines. . . . Please permit Mr. Pearlman to continue use of his current medical marijuana prescription throughout his trial. It will permit him to function more normally throughout the trial.

> *Id.*

As described by Dr. Howard, the positive effect on Mr. Pearlman's health from taking medical marijuana is readily apparent. First and foremost, Mr. Pearlman no longer takes opioids. At the zenith of his opioid use, Mr. Pearlman was taking powerful oxycontin three times a day, oxycodone one to two times a day, and 800 mcg of Subsys four times a day. The side effects of high-level, long-term opioid use can "interfere with long- and short-term memory," and, more seriously, "the death rate associated with opioid pain medication has increased markedly." Mot. to Remove Drug Testing Condition, at pp. 6-7 [Dkt. Entry No.

10

36]. Both of Mr. Pearlman's physicians have warned that a return to opioids is not medically advisable. Ex. 11 (9/21/16 examination by Dr. Sen noting that Mr. Pearlman should be kept off opiates); Ex. 4 (8/8/16 examination by Dr. Howard noting that "returning to the use of narcotics and benzodiazeipines is not recommended"). Medical marijuana has effectively replaced the dangerous amounts of opioids that Mr. Pearlman had been taking for years without the serious side effects.

      Second, Mr. Pearlman's mental health has greatly improved. Prior to Mr. Pearlman's decision to stop opioids, he was taking two to three different drugs for pain (Oxycontin, Oxycodone, and, previously, Subsys), and had taken six different drugs for his mental health (Xanax, Wellbutrin, Oleptro, Ambien, Effexor, and Prozac). Today, Mr. Pearlman does not take Oxycontin or Oxycodone, no longer needs any of the drugs for depression (Wellbutrin, Oleptro, Effexor, and Prozac), and, while Mr. Pearlman used to take Xanax every day and Ambien every night, he now only takes it as needed. Ex. 2. Mr. Pearlman's thinking is clearer and more focused, and is no longer impacted by the impairment of opioids. As described by Dr. Howard, "[s]ince starting the medical marijuana program, Mr. Pearlman has demonstrated less pain overall, more mobility, more mental focus, and less anxiety." Ex. 3.

11

In short, medical marijuana has completely replaced all other pain medications, and allowed Mr. Pearlman to cease antidepressants and take less anxiety and sleep medication. His mental function has drastically improved from when he was on opioids when his thought process was flawed and his thinking was foggy. He is "[o]verall significantly better on MMP [medical marijuana program] than traditional pain treatments [and] functions much better on MMP than with traditional medications." Ex. 4, at 3; Ex. 3 (noting that medical marijuana has "dramatically improved his quality of life"). Most importantly, opioids, with all of their dangerous side effects and health risks, are no longer the center of his life.

### III. THERE ARE NO MEDICALLY ADVISABLE ALTERNATIVES THAT WILL PROVIDE SUFFICIENT RELIEF TO MR. PEARLMAN'S CONDITIONS

Mr. Pearlman and his doctors have attempted to alleviate his pain and other medical conditions through a variety of methods: (1) physical therapy; (2) injections; (3) nerve ablation; and (4) medications. Unfortunately, each has either failed to give him lasting relief or is otherwise not sustainable.

First, Mr. Pearlman has attempted physical therapy multiple times over the last twenty years. Unfortunately it has not provided any meaningful relief. *See* Ex. 6 (2/26/13 medical report from Dr. Patharkar) ("His past treatments include physical therapy with no relief."); Ex. 10, at 2 (8/8/16 medical report from Dr. Sen) (noting that physical therapy has been tried for "couple of years (no help)"). Most recently, Mr. Pearlman tried a course of physical therapy last Fall at the suggestion

of Dr. Sen, but the therapy, again, did not provide any relief.  Indeed, Mr. Pearlman's insurance company declined to pay for any additional physical therapy, stating: "you have reached maximum benefit from the treatment you have been receiving . . . Your evaluation findings are not improving.  Using the same or similar type of treatment is not likely to improve your condition.  Treatment should change or stop."   Ex.  14.

Second, epidural steroid injections ("ESIs") have provided short-term pain relief for Mr. Pearlman, but unfortunately the partial relief that is provided wears off after 1-4 weeks.  *See* Ex. 11 (9/21/16 medical report from Dr. Sen) (injection provided "50% relief of pain for approximately 1 week, however his pain has returned.").  Unfortunately, it is not medically sound to continuously receive injections every week.  Such injections normally can only be performed a few times a year.  *See, e.g.,* Mayo Clinic:  Back Pain, *available at http://www.mayoclinic.org/diseases-conditions/back-pain/expert-answers/epidural-steroid-injections/faq-20058277* (last accessed January 30, 2017) ("Epidural steroid injections are usually limited to just a few a year because there's a chance these drugs might weaken your spinal bones and nearby muscles."). Finally, as with many of these treatments and drugs, the injections, which cost over $10,000 for each procedure, will likely be cost prohibitive once Mr. Pearlman's COBRA runs out.  Thus, while the injections have been useful, they are only

temporary, provide only partial relief, can only be performed a limited number of times, and it may not be possible to continue with them in the future.

Third, Mr. Pearlman had a nerve ablation, i.e. burning of the nerve believed to be causing pain, but it unfortunately did not resolve his symptoms. His pain levels remained fairly constant both before and after the ablation. Ex. 1. Ideally, a nerve ablation is supposed to last longer than an injection, but it, too, is only temporary. *See* Mayo Clinic: Radiofrequency Neurotomy, *available at http://www.mayoclinic.org/tests-procedures/radiofrequency-neurotomy/basics/results/prc-20013452* (last accessed January 30, 2017). In addition, even if it were to provide relief, with so many levels of injury in the lumbar and thoracic areas, nerves up and down Mr. Pearlman's spine would have to be ablated, which is not a viable option. Moreover, like injections, the cost is prohibitive.

Finally, Mr. Pearlman has taken a number of medications throughout the years, but none are viable replacements for medical marijuana. Returning to opioids is simply not a medically advisable option for Mr. Pearlman. Ex. 11 (9/21/16 examination by Dr. Sen); Ex. 4 (examination by Dr. Howard). Two other medications, Gabapentin and Lyrica, were also provided to Mr. Pearlman, but they did not alleviate his pain and were accompanied by "sedation and disorientation." Ex. 11 (9/21/16 examination by Dr. Sen). This led Dr. Sen to conclude in late

September that his "only alternative in this situation is to consider a repeat epidural steroid injection." *Id.*

The only other option that Dr. Sen has ever mentioned to Mr. Pearlman is the possibility of spinal surgery, although Dr. Sen could not provide any details as he is not a spinal surgeon. At this point it is unknown what such a surgery, even if it were possible, would entail. However, any spinal surgery would raise multiple problems: (1) Mr. Pearlman has herniations at multiple levels in the thoracic and lumbar spine in addition to two slipped discs. Thus, even assuming there was a surgery that could help Mr. Pearlman, it seemingly would entail multiple surgeries, each of which has its own risks; (2) any surgery would require recuperation accompanied by significant pain, leaving Mr. Pearlman in the same situation of needing pain relief, but not being able to use opioids; and (3) there is no certainty that any surgery could fix Mr. Pearlman's issues. As noted by Dr. Howard,

> Surgery is another traditional option, but may require multiple operations in different regions of his spine, requiring many months, if not years, of rehab. It is best to avoid surgery on the spine if at all possible. Spine surgery has limited efficacy long term, and is associated with many risks.

Ex. 3. Moreover, given Mr. Pearlman's precarious health insurance situation, any surgery, which would likely cost tens of thousands of dollars, would likely be cost prohibitive.

In short, Mr. Pearlman does not have any viable medical alternatives to medical marijuana. His pain is persistent and he and his doctors have attempted to alleviate the pain through multiple methods. The only successful treatments have been opioids (which Mr. Pearlman should no longer take), injections (which only provide temporary relief and may soon be cost prohibitive), and medical marijuana. Medical marijuana is the safest option, the treatment that best alleviates Mr. Pearlman's pain, likely the only treatment he will be able to afford, and the only one of these treatments that also helps to alleviate his psychological ailments. Denying Mr. Pearlman medical marijuana denies him the ability to relieve his serious pain and have a clear mind and focus to address the serious charges against him and fully participate in his defense.

To address Your Honor's concerns about the effect of this ruling on other defendants, we note two points. First, every bail decision is made on an individualized basis. A court must impose the least restrictive conditions necessary when considering the particular defendant's charged offense, the weight of the evidence, the history and characteristics of the defendant, and the danger to the community. 18 U.S.C. § 3142(g). These factors are going to be strikingly different for every defendant. Thus, recognizing the unique facts and circumstances of Mr. Pearlman's health condition, which justify the removal of his drug-testing condition, would not create a precedent that dissimilar defendants

could rely upon to remove drug testing as a bail condition. In this case drug testing is not required to insure Mr. Pearlman's appearance in Court. Neither do Mr. Pearlman's prescriptions and use of marijuana pose a danger to his community. His marijuana is not purchased from criminal elements but rather from state-licensed and heavily regulated dispensaries. In sum, Mr. Pearlman's medical marijuana treatments, prescribed by his physician, in full compliance with New Jersey state law, has materially bettered his quality of life and is necessary for his physical and mental health. Nothing in his history or characteristics merit imposing a drug testing condition that would only serve to imperil Mr. Pearlman's health.

## CONCLUSION

For the reasons stated above, in conjunction with those contained in Mr. Pearlman's initial brief, and made during oral argument before this Court, the drug testing condition imposed on Mr. Pearlman is excessive and not necessary pursuant to the factors set forth in 18 U.S.C. § 3141. Moreover, imposing such a condition exerts an undue burden on Mr. Pearlman, effectively punishing him for making the difficult decision to find an alternative to addictive opioids. Neither the Government nor pretrial services have argued that Mr. Pearlman is a risk for flight or a danger to the community – the two goals of the Bail Reform Act. Since the drug testing condition is not necessary to achieve those goals, it simply should not

be imposed.  Forcing Mr. Pearlman back on opioids would endanger his health and prevent him from fully participating in his own defense.  Both equity and law compel the result sought; allowing Mr. Pearlman to continue using medical marijuana to manage and treat his pain and chronic medical conditions.


Dated:   February 1, 2017　　　　**KATTEN MUCHIN ROSENMAN LLP**

By:　_/s/ Scott A. Resnik_
　　　Scott A. Resnik
　　　Michael M. Rosensaft
　　　575 Madison Avenue
　　　New York, New York 10022-2585
　　　(212) 940-8800 (phone)
　　　(212) 940-8776 (fax)

**CERTIFICATION**

I hereby certify that on February 1, 2017, a copy of the foregoing was filed electronically and will be served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic filing. Parties may access this filing through the Court's CM/ECF System.

*/s/ Michael M. Rosensaft*
Michael M. Rosensaft
