UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:17cr27(MPS) |
| | : | |
| | : | VIOLATIONS: |
| v. | : | 18 U.S.C. § 371 |
| | : | (Conspiracy) |
| | : | |
| JEFFREY PEARLMAN | : | |

INDICTMENT

The Grand Jury charges:

COUNT ONE
(Conspiracy to Violate the Anti-Kickback Law)

**General Allegations**

1.  At all times relevant to the Indictment, the defendant, JEFFREY PEARLMAN ("PEARLMAN"), was employed by Insys Therapeutics ("Insys"), which was headquartered in Chandler, Arizona. The defendant was employed by Insys from approximately September 2012 until November 2015.

2.  Every manufacturer of a new drug was required to obtain approval of a new drug application ("NDA") from the United States Food and Drug Administration ("FDA") before introducing its new drug into interstate commerce, unless subject to an exemption not applicable here. To obtain approval of an NDA, the manufacturer had to demonstrate to the FDA that the new drug was safe and effective for its intended uses. Labeling on the drug also had to be truthful, accurate and non-misleading.

3.  On or about March 4, 2011, Insys submitted an NDA to the FDA seeking approval of its fentanyl spray, known as Subsys. The FDA approved Subsys in or about January 2012 for

1

the management of breakthrough pain in patients with cancer, 18 years of age or older, who were already receiving and who were already tolerant to opioid therapy for their underlying persistent cancer pain. The label for Subsys warned that the drug posed risks of misuse, abuse, addiction, overdose, and serious complications due to medication errors. Explicit warnings on the Subsys label included that, as an opioid agonist, the drug could be abused in a manner similar to other opioid agonists, legal or illicit.

4. Insys first hired PEARLMAN as a sales representative and, in February 2013, promoted him to the position of District Sales Manager ("DSM"). At times relevant to this Indictment, PEARLMAN was responsible for managing Insys sales representatives in Connecticut, New York, New Jersey, Massachusetts, and Rhode Island. As part of his duties as an Insys DSM, PEARLMAN managed a team of sales representatives who called on licensed health care providers, including physicians, advanced practice registered nurses ("APRNs"), and physician assistants in order to get them to prescribe the drug Subsys.

5. Licensed medical practitioners who were registered with the Drug Enforcement Administration ("DEA") and able to prescribe opioids in the usual course of professional practice for a legitimate medical purpose, owed a fiduciary duty to their patients to refrain from accepting or agreeing to accept bribes and kickbacks in exchange for prescribing any drug.

6. At all times relevant to the indictment, Practitioner #1, whose identity is known to the Grand Jury, was a licensed medical practitioner who was registered by the DEA to prescribe opioids in the usual course of professional practice for a legitimate medical purpose. Practitioner #1 practiced as an APRN for a pain management practice with offices in Derby and Meriden, Connecticut. Practitioner #1 was associated with Insys and conspired with PEARLMAN and

other persons and entities known and unknown to the Grand Jury to engage in various criminal activities as described below.

7. The Medicare Program was established in 1965 pursuant to amendments to the Social Security Act. The Medicare Program is a health care benefit program that provides basic health insurance coverage to certain disabled persons as well as to individuals 65 years or older. Eligible persons can elect to participate in the program by completing an application and either agreeing to pay a premium for Medicare benefits, or arranging for a third party to pay such premiums. Persons enrolled in the Medicare programs are hereinafter referred to as "beneficiaries."

8. The Medicare program also includes a prescription drug program known as "Part D," which is funded by insurance premiums paid by enrolled Medicare beneficiaries and contributions from the United States Treasury. The Part D program is administered by many "Plan Sponsors," each of which dictates the specific drugs it will cover and how much it will pay for those medications. The Centers for Medicare and Medicaid Services ("CMS"), through the United States Treasury, reimburses the Part D Plan Sponsors for the covered drugs. Medicare is a "federal health care program" under Title 42, United States Code, Section 1320a-7b(f) and a "health care benefit program" under Title 18, United States Code, Section 1347.

9. Each of these Part D Plan Sponsors will approve payment for the Subsys that is prescribed to a Medicare patient only if certain criteria are met, including (i) that the patient has a diagnosis of cancer, (ii) that the use of Subsys is for breakthrough cancer pain, and (iii) that other strong-acting narcotic pain relievers have been tried and been ineffective, not tolerated or contraindicated.

10.     In or about March 2012 through in or about August 2012, Insys created, operated, and funded a marketing program (the "Speaker Program") purportedly intended to increase brand awareness using peer-to-peer educational lunches and dinners (the "events"). Insys policy required sales representatives, also called Specialty Sales Professionals, to recruit licensed practitioners to lecture other licensed practitioners regarding the use of Subsys for the treatment of breakthrough cancer pain in opioid tolerant patients. Insys policy also required speakers to be chosen and approved based upon various criteria, including skill in the use of opioids as treatment, experience with Subsys, geography, prominence, and experience as speakers. In exchange for practitioners speaking to other prescribers about Subsys, Insys agreed to pay each speaker a fee, also referred to as an "honorarium," for each event. Speakers were required to sign written agreements with Insys that, among other things, required them to attend organized training sessions. Sales representatives began looking for qualified speakers during the second quarter of 2012. As is discussed below, in truth PEARLMAN and Insys used the Speaker Program to reward licensed practitioners for prescribing Subsys.

11.     In or about August 2012, after speaking with Practitioner #1 about Subsys, a sales representative for Insys informed employees of Insys that Practitioner #1 "expressed interest in becoming a speaker for us and I told her I would let her know as soon as we had another training scheduled."

12.     In or about October 2012, Practitioner #1 signed a speaker agreement with Insys. In or about November 2012, an Insys executive emailed "[t]his clinician is writing, she has experience... She needs to speak ASAP." A sales representative responded, "[d]amn Right [sic]. I know she was all fired up to get trained on the last training session. She definitely wants to speak,

... [the assigned sales representative has] been in there working to get her dates and places lined up, she got wacked [sic] by the storm so that put things back. That's why I told him to plan it, TELL her when and where. And done. It's not rocket science."

13.     By in or about March 2013, Practitioner #1 averaged approximately 0.9 Subsys prescriptions per week. In the spring of 2013, in a private meeting, an Insys sales representative promised Practitioner #1 payment for additional Speaker Program events in exchange for writing more prescriptions for Subsys.

14.     On or about April 12, 2013, a sales representative for Practitioner #1 emailed PEARLMAN, stating, "[y]ou and I both know my goals for ... [Practitioner #1] and what she is verbally agreeing to do. ... on Monday I will email you to get the ISP [Insys Speaker Program] when she gives me a firm agreement on what we discussed earlier this week."

15.     On or about June 5, 2013, PEARLMAN expressed frustration with Practitioner #1 in an exchange of emails with the assigned Insys sales representative. PEARLMAN wrote, "[w]hat I am concerned about is you and I spoke about 6 weeks ago when we were giving her this extra program and asked if her finding 1 new patient a week was a reasonable expectation and something to be accountable to. You told me she said yes and that you would be able to hold her accountable to that. In looking at 1 new patient in April and just 1 in May it is clear that is not happening. Keep in mind these emails are for you and me, not her. But our conversation was very clear about what had to happen. I am not sure why from the tone of your reply you now are seeming to hedge off of that commitment? Very simply when I look at return on investment as she has not motivated any new prescribers as of yet and she is not significantly increasing her own business, I am going to have tremendous difficulty in justifying more programs."

16.     By on or about July 19, 2013, Practitioner #1 had increased her Subsys prescriptions to an average of approximately 2.3 each week. By on or about September 27, 2013, Practitioner #1 averaged approximately three Subsys prescriptions each week.

### The Conspiracy

17.     From in or about April 2013 until in or around March 2015, within the District of Connecticut and elsewhere, the defendant, JEFFREY PEARLMAN, knowingly conspired with others known and unknown to the Grand Jury to commit an offense against the United States, that is, to knowingly and willfully offer and pay remuneration, directly and indirectly, overtly and covertly, in cash and in kind, that is, kickbacks and bribes, from Insys, to induce physicians and other health care professionals to purchase, order, and arrange for goods, services and items, that is, prescriptions for Subsys, for which payment may be made in whole and in part by a federal health care program, in violation of Title 42, United States Code, Section 1320a-7b(b)(2).

### Object of the Conspiracy

18.     The object of the conspiracy was for PEARLMAN to cause the unlawful payment of kickbacks to Practitioner #1, and the receipt of kickbacks by Practitioner #1, as an inducement and in exchange for her prescribing Subsys to her patients.

### Manner and Means of the Conspiracy

The manner and means by which defendant JEFFREY PEARLMAN sought to accomplish the object of the conspiracy included the following:

19.     It was part of the conspiracy that, in order to induce pain specialists and other providers to prescribe Subsys to patients who were not suffering from breakthrough cancer pain, Insys created the Speaker Program. Insys officials publicly claimed that the purpose of the

6

Speaker Program was to educate other providers concerning the benefits of Subsys. In reality, the primary purpose of the Speaker Program was to provide a financial reward to providers, like Practitioner #1, who were prescribing large amounts of Subsys and to incentivize those providers to continue to prescribe Subsys in the future.

20.     It was part of the conspiracy that PEARLMAN would and did train sales representatives of Insys that the Speaker Program was to be used only for practitioners who were actively writing prescriptions for Subsys.

21.     It was part of the conspiracy that PEARLMAN would and did use the Insys Speaker Program to induce Practitioner #1 to write more prescriptions for Subsys for current patients and to increase the titration of such prescriptions.

22.     It was part of the conspiracy that PEARLMAN would and did use the Insys Speaker Program as a way to get Practitioner #1 to write new prescriptions for Subsys for new patients.

23.     It was part of the conspiracy that PEARLMAN knew that the Insys Speaker Program was a sham program disguised as a way to induce Practitioner #1 and other licensed practitioners to write prescriptions for Subsys.

24.     It was part of the conspiracy that many of the sham Speaker Program events for Practitioner #1 had no attendees, other than Practitioner #1 and the Insys sales representative, despite Insys falsely stating that other people were present.

25.     It was part of the conspiracy that for numerous of the sham Speaker Program events conducted by Practitioner #1 at PEARLMAN's direction, the attendees were friends and family members of Practitioner #1. In addition, the attendees' signatures at such sham Speaker Program events were regularly forged to falsely make it appear that medical professionals attended the

programs. In addition, extra meals were often ordered to make it appear on the restaurant receipt that other persons attended the event.

26. It was part of the conspiracy that, in order to increase her remuneration from Insys, Practitioner #1 was told by PEARLMAN and others that to get more speaking programs from Insys she had to write more prescriptions for Subsys.

27. It was part of the conspiracy that PEARLMAN caused speaker fees to be paid to Practitioner #1 only after she wrote more prescriptions for Subsys, including prescriptions that were paid for by federal programs.

### Overt Acts

28. In furtherance of the conspiracy, and to accomplish its purposes and objects, the defendant, JEFFREY PEARLMAN, together with others known and unknown to the Grand Jury, committed and caused others to commit at least one of the following overt acts, among others, in the District of Connecticut:

    a. In or about April 2013, PEARLMAN advised an Insys sales representative that Practitioner #1 needed to commit to one new prescription a week in order for her to continue to participate in the Speaker Program.

    b. In or about April 2013, PEARLMAN advised Practitioner #1 that she needed to commit to one new prescription a week in order for her to continue to participate in the Speaker Program.

    c. On or about April 12, 2013, PEARLMAN and a sales representative of Insys emailed with each other about the verbal agreement to increase the number of

Speaker Program events for Practitioner #1 if she increased the number of prescriptions she wrote.

  d. On or about May 17, 2013, PEARLMAN emailed a sales representative that if Practitioner #1 did not pull through with "1 new patient/week" PEARLMAN and the Insys sales representative will not realize "the income [they] want to see."

  e. On or about June 5, 2013, PEARLMAN emailed an Insys sales representative that he could not justify further participation in the Speaker Program without more prescriptions for Subsys being written by Practitioner #1 due to a lack of "return on investment."

  f. On or about June 18, 2013, PEARLMAN was present for a sham Speaker Program in which the sign-in sheets were forged with people's names who did not attend and at which Practitioner #1 was told by PEARLMAN not to worry about the Speaker Program but instead to focus on writing prescriptions for Subsys.

  g. On or about June 19, 2013, PEARLMAN emailed an Insys executive regarding his kickback arrangement with Practitioner #1 writing "[a]fter my trip yesterday and today I am telling you to watch out for [Practitioner #1] . . . [I] wouldn't be the sales person I am if I didn't believe in what I think I just accomplished and what I expect to see."

  h. On or about June 27, 2013, PEARLMAN emailed the same Insys executive "That's right, 5 from [Practitioner #1] today."

  i. Between in or about April 2013 and March 2015, many of the Speaker Program events attended by Practitioner #1 were sham events that were mere social

gatherings also attended by the friends and office staff of Practitioner #1, many of which were facilitated by PEARLMAN.

    j.    Between in or about April 2013 and March 2015, Medicare Part D plans authorized payment for approximately 391 Subsys prescriptions written by Practitioner #1 due to her participation in the sham Speaker Program.

    k.    Between in or about January 2013 and April 2015, PEARLMAN and co-conspirators known and unknown to the Grand Jury, sent and caused to be sent to Practitioner #1 checks totaling approximately $83,500 in bribes and kickbacks resulting from Practitioner #1's participation in the Speaker Program.

All in violation of Title 18, United States Code, Section 371.

                A TRUE BILL

                /s/
                _____
                FOREPERSON

UNITED STATES OF AMERICA

_____
DEIRDRE M. DALY
UNITED STATES ATTORNEY

_____
DOUGLAS P. MORABITO
ASSISTANT UNITED STATES ATTORNEY